# EXHIBIT B

2019 WL 148711
Only the Westlaw citation is currently available.
United States District Court,
N.D. Iowa, Eastern Division.

Joan THOMPSON-HARBACH, Plaintiff,

v.

USAA FEDERAL SAVINGS BANK, [1] Defendant.

No. 15-CV-2098-CJW-KEM
|
Signed 01/09/2019

**Attorneys and Law Firms**

J.D. Haas, J.D. Haas & Associates, PLLC, Bloomington, MN, Jace T. Bisgard, Shuttleworth & Ingersoll, PLC, Cedar Rapids, IA, for Plaintiff.

David Matthew Krueger, Pro Hac Vice, Benesch Friedlander Coplan & Arnoff LLP, Cleveland, OH, Kevin J. Visser, Simmons Perrine Moyer Bergman PLC, Cedar Rapids, IA, for Defendant.

### ORDER

C.J. Williams, United States District Judge

### TABLE OF CONTENTS

**\*1** I. PROCEDURAL HISTORY...——

II. FACTUAL HISTORY...——
A. The Credit Card Agreement...——

B. Defendant's Telephone Calling Equipment...——

C. Defendant's Telephone Calls to Plaintiff...——

D. Defendant's Internal Policy...——

III. STANDARD FOR SUMMARY JUDGMENT...——

IV. DISCUSSION...——
A. The TCPA...——

B. Whether Defendant Called Plaintiff's Cellular Telephone...——

C. Whether Defendant Used an ATDS Device to Call Plaintiff...——

1. FCC Rulings and ACA International...——

2. Whether the Predictive Dialer in this Case Was an ATDS...——

D. Whether Defendant Called Plaintiff Without Plaintiff's Prior Consent...——

1. Oral Withdraw of Consent...——

2. Legally Sufficient Oral Withdrawal of Consent...——

a. Limitations on Means of Withdrawing Consent...——

b. Restrictions on Means of Withdrawing Consent...——

c. Defendant's Internal Policy...——

V. CONCLUSION...——

This matter is before the Court on plaintiff's Motion for Summary Judgment (Doc. 49), defendant's Motion for Summary Judgment (Doc. 50), defendant's Motion to Strike Plaintiff's Summary Judgment Evidence (Doc. 52), and defendant's Motion to Exclude Plaintiff's Expert Report and Testimony. (Doc. 53). For the reasons that follow, the Court **denies** plaintiff's Motion for Summary Judgment (Doc. 49), **grants** defendant's Motion for Summary Judgment (Doc. 50), and **denies as moot** defendant's motions to Strike Plaintiff's Summary Judgment Evidence (Doc. 52) and to Exclude Expert Report and Testimony. (Doc. 53).

### *I. PROCEDURAL HISTORY*

On November 19, 2015, plaintiff filed a one-count complaint against defendant alleging a violation of the Telephone Consumer Protection Act (TCPA), Title 47 United States Code, Section 227, claiming defendant placed "at least seventy-one (71) collection calls to Plaintiff" after plaintiff had requested defendant cease placing such calls. (Doc. 2, at 2-3). Defendant filed an

answer on January 28, 2016 (Doc. 11), and subsequently filed a motion to stay proceedings pending the outcome of cases before the United States Supreme Court and the District of Columbia Circuit Court of Appeals. (Doc. 12). On March 23, 2016, the Court granted the motion to stay. (Doc. 13). Approximately two years later, on March 26, 2018, the parties notified the Court that the D.C. Circuit Court of Appeals had issued its opinion, and the parties jointly requested that the Court lift the stay. (Doc. 28). On March 29, 2018, the Court entered an Order lifting the stay. (Doc. 29). After the stay was lifted, the Court entered a Scheduling Order and a Trial Management Order, which set certain deadlines, including an October 26, 2018 deadline for filing dispositive motions. (Docs. 35, 36).

On October 26, 2018, the parties filed cross motions for summary judgment. (Docs. 49, 50). Defendant also filed a motion to strike the Interactive Intelligence Interaction Dialer Administration Guide exhibit contained in plaintiff's brief (Doc. 52), and a motion to exclude plaintiff's expert's testimony and report pursuant to Federal Rules of Evidence 702 and 703. (Doc. 53). The parties filed their final reply briefs on December 7, 2018, and the Court considers the motions now fully submitted. Neither party requested a hearing on the pending motions and the Court finds a hearing unnecessary.

## II. FACTUAL HISTORY [2]

### A. The Credit Card Agreement

**\*2** On December 14, 2007, plaintiff acquired an American Express credit card with defendant. On August 12, 2014, plaintiff entered into an Online Agreement with defendant regarding that credit card account. [3] The Online Agreement states:

TELEPHONE CONTACTS

We may contact you at the phone numbers in your profile.

You authorize USAA to contact you at the telephone numbers in your profile. For example, we may contact you by telephone if we detect suspicious activity on your accounts, or when we have important information to provide you. To grant or revoke this authorization, you may edit your profile by removing telephone numbers on which you do not want to receive such calls.

Plaintiff provided a telephone number with the last four digits 9507 in her online profile as her contact number ("plaintiff's telephone number"). [4] Plaintiff did not thereafter reject or withdraw from the Online

Agreement, nor did plaintiff edit her profile to remove her telephone number.

### B. Defendant's Telephone Calling Equipment

Defendant used an Aspect Unified IP, Model No. 7.3 and/or Aspect Initiated Contact Systems ("Aspect Dialer") to make calls to its clients regarding their credit card accounts. To call a client using the Aspect Dialer, defendant had to upload the client's telephone number into the Aspect Dialer for dialing. Defendant could use the Aspect Dialer to create different "Campaigns" [5] for dialing specific telephone numbers based on different criteria.

**\*3** To dial any specific number on a Campaign, the Aspect Dialer allows a user to manually dial the telephone number, or the Aspect Dialer may be configured to automatically dial the stored telephone numbers without the need for a human being to physically dial or push a button to make the call. The Aspect Dialer can only call the specific stored telephone numbers on a Campaign, and cannot independently generate any other telephone numbers to be called. The Aspect Dialer is incapable of using a random number generator to generate random telephone numbers for dialing. Plaintiff's expert, Randall Snyder, agreed in a deposition that the Aspect Dialer is not capable of generating random telephone numbers or sequential blocks of telephone numbers for dialing. Although a collection company defendant engaged used another type of dialing system called an Interaction Dialer, defendant itself did not use that type of system. Even if defendant is liable for that company's use of an Interaction Dialer, however, plaintiff's own expert admits that like the Aspect Dialer, an Interaction Dialer is incapable of generating random or sequential number lists for dialing, and can only dial specific telephone numbers it is provided.

### C. Defendant's Telephone Calls to Plaintiff

On August 1, 2015, defendant began using the Aspect Dialer to call plaintiff's telephone number regarding plaintiff's credit card account. Plaintiff admitted the calls were not random and that defendant was specifically trying to get in contact with plaintiff—using a telephone number plaintiff provided—regarding plaintiff's existing debt.

During the August 1, 2015 telephone call, plaintiff informed defendant that plaintiff was working with

a consumer credit counseling service, and plaintiff complained about defendant's call, but was advised that the calls would continue. Defendant called plaintiff again on August 5, 2015. During this call, plaintiff informed defendant that plaintiff had previously tried to make payment arrangements and was working with debt consultants. Plaintiff alleges that during this call, she asked defendant to stop calling her; defendant denies this allegation.

Between August 8, 2015, and September 17, 2015, defendant used the Aspect Dialer to place thirty-four telephone calls to plaintiff using the Aspect Dialer. During a telephone call on August 13, 2015, plaintiff asked defendant not to call her, which request was noted in defendant's account notes. During a telephone call on August 25, 2015, plaintiff again stated that she was working with a credit counseling service and wondered why defendant was still calling her. Plaintiff asserts that during this call she requested that defendant stop calling her; defendant denies that plaintiff requested that defendant stop calling plaintiff during the August 25, 2015 telephone call.

On September 18, 2015, defendant assigned collection of plaintiff's account to United Recovery Systems (a/k/a Alltran Financial) ("URS"). URS then placed fifty-three calls to plaintiff's telephone number between September 22, 2015, and January 11, 2016. Twelve of these calls were made using equipment from Interactive Intelligence Group, Inc., using an Interaction Dialer; the remaining calls "were made with manual-only dialing equipment, which is separate and distinct from the Interaction dialer, and for which a human being is required to manually initiate any and all calls made using that equipment (including all calls to the x9507 Number)." (Doc. 5, at 9).

### D. Defendant's Internal Policy

Defendant maintains an internal policy manual regarding making calls to clients. The manual sets out procedures for its employees to follow. One such procedure states: "Revocation of Consent—Members may revoke their prior express consent to receive autodialed and prerecorded calls at any time through reasonable means." (Doc. 49-3, at 125). Another procedure provides: "Note: Revocation of Consent may be revoked orally or in writing by members." (*Id.*). Defendant's clients do

not have access to and are not provided with copies of defendant's internal policies. [6]

## III. STANDARD FOR SUMMARY JUDGMENT

**\*4** Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A movant must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, ... admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B).

A fact is "material" if it "might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395. Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See*

*Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88 (citation omitted); *see also Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record ... that no reasonable jury could believe' them") (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) ). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). Rather, a "court's function is to determine whether a dispute about a material fact is genuine ...." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

The mere existence of cross motions for summary judgment does not mean the parties are taking inconsistent positions. There may be genuine issues of material facts with regard to one motion, but not the other. Where a court confronts cross motions for summary judgment, the court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion. *Weber v. Travelers Home & Marine Ins. Co.*, 801 F. Supp. 2d 819, 825 (D. Minn. 2011). On cross motions for summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purpose of the party's own motion. *C. Line, Inc. v. City of Davenport*, 957 F. Supp. 2d 1012, 1024 (S.D. Iowa 2013). A court must consider each motion separately. *Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 946 (S.D. Iowa 2005) (internal citations omitted).

**\*5** Moreover, the presentation of cross motions for summary judgment does not mandate that a court grant summary judgment in favor of one side or the other. *Hot Stuff Foods, LLC v. Houston Cas. Co.*, 771 F.3d 1071, 1076 (8th Cir. 2014). Similarly, the filing of cross motions for summary judgment does not mean that the parties have waived their right to trial. *See Wermager v. Cormorant*

*Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." (citations omitted) ).

## IV. DISCUSSION

Plaintiff's complaint brings a single count alleging that defendant negligently and willfully violated the TCPA by repeatedly calling plaintiff after plaintiff withdrew her consent to be called. (Doc. 2). In order for plaintiff to prevail on her TCPA claim, she must prove that defendant (1) called her cellular telephone, (2) "using an automatic telephone dialing system" ("ATDS") or "an artificial or prerecorded voice," (3) without her "prior express consent." *Smith v. Securus Techs., Inc.*, 120 F. Supp. 3d 976, 980 (D. Minn. 2015) (citations omitted) (identifying elements of a TCPA claim); *Riazi v. Ally Fin., Inc.*, No. 4:17CV1705JCH, 2017 WL 4269791, at *1 (E.D. Mo. Sept. 26, 2017) (same). The TCPA authorizes recovery "for actual monetary loss from [a violation of the TCPA], or to receive $500 in damages for each such violation, whichever is greater." 47 U.S.C. § 227(b)(3)(B). If a defendant's violation of the TCPA is found to be willful or knowing, a court can impose an award of up to $1,500 for each violation of the TCPA, regardless of the plaintiff's actual monetary loss. 47 U.S.C. § 227(b)(3).

To determine whether summary judgment is appropriate for either party, the Court must first grapple with the scope and application of the TCPA. The Court will then assess whether a genuine issue of material fact exists as to each element of plaintiff's TCPA claim and whether summary judgment is appropriate for either party.

### A. The TCPA

"Congress enacted the TCPA to protect consumers from the 'proliferation of intrusive [telemarketing] calls to their homes.' " *Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 819 (8th Cir. 2015) (alteration in original) (quoting *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) ). The key provision of the TCPA applicable to this case is Section 227(b)(1)(A)(iii), which provides, in pertinent part:

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

....

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call ....

47 U.S.C. § 227(b)(1)(A)(iii). In short, as is applicable in this lawsuit, the TCPA prohibits "mak[ing] any call (other than a call ... made with the prior express consent of the called party) using any [ATDS] ... to any telephone number assigned to a ... cellular telephone service ...." *Id.* The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* § 227(a)(1). The Federal Communications Commission ("FCC") has the authority to promulgate regulations implementing the TCPA. *Id.* § 227(b)(2); *ACA Int'l v. FCC*, 885 F.3d 687, 693 (D.C. Cir. 2018). In 1992, the FCC promulgated regulations that were adopted without elaboration and that established the statutory definition of ATDS. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("1992 Order"), 7 FCC Rcd. 8752, 8792 App'x B (1992) (amending 47 C.F.R. § 64.1200).

 **\*6** In 2003, the FCC promulgated regulations revising the interpretation of the term ATDS to also include a "predictive dialer," meaning "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2003 Order"), 18 FCC Rcd. 14014, 14091-93 (2003) (footnote omitted). As the FCC explained, a predictive dialer consists of "hardware" that, "when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." *Id.* at 14091 (footnote

omitted). Telemarketers using predictive dialing software "program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call." *Id.* (footnote omitted). The FCC noted that "[t]he principal feature of predictive dialing software is a timing function, not number storage or generation." *Id.*

The 2003 Order observed that, "[i]n the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily." *Id.* at 14092. The FCC reasoned, however, that "to exclude ... equipment that use[s] predictive dialing software from the definition of [ATDS] simply because it relies on a given set of numbers"—rather than generating the numbers itself —"would lead to an unintended result." *Id.* at 14092. The FCC concluded that Congress could not have intended for it to be "permissible" to make calls to "wireless numbers ... when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages." *Id.* In reaching this conclusion, the FCC stated that the TCPA's definition of ATDS "contemplates autodialing equipment that either stores or produces numbers," and also that the definition encompasses all "equipment" with the " 'capacity to store or produce telephone numbers.' " *Id.* at 14091-2 (emphasis omitted) (quoting 47 U.S.C. § 227(a)(1) ).

The FCC further found that by enacting this broad definition of ATDS, "Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies." *Id.* at 14092 (footnote omitted). The FCC opined that Congress's primary purpose in enacting the TCPA was "to alleviate a particular problem—an increasing number of automated and prerecorded calls to certain categories of numbers." *Id.* at 14092 (footnote omitted). The FCC noted that "the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective" than the past practice of "us[ing] dialing equipment to create and dial 10-digit telephone numbers arbitrarily." *Id.* at 14092 (footnote omitted). Accordingly, the FCC found that "a predictive dialer falls within the meaning and statutory definition of [ATDS] and the intent of Congress." *Id.* at 14093 (footnote omitted).

In 2008, the FCC affirmed its 2003 Order. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act*

*of 1991* ("2008 Declaratory Ruling"), 23 FCC Rcd. 559, 566 (2008) ("In this Declaratory Ruling, we affirm that a predictive dialer constitutes an [ATDS] and is subject to the TCPA's restrictions on the use of autodialers."). In its 2008 Declaratory Ruling, the FCC rejected the argument that a "predictive dialer meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists," and refused to reconsider its 2003 Order. *Id.*

In 2015, the FCC again reaffirmed its 2003 Order. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2015 Declaratory Ruling"), 30 FCC Rcd. 7961, 7971-72 (2015) ("We ... reiterate that predictive dialers ... satisfy the TCPA's definition of "autodialer." (footnote and internal quotation marks omitted) ). The FCC reasoned "that predictive dialers, like dialers that utilize random or sequential numbers instead of a list of numbers, retain the capacity to dial thousands of numbers in a short period of time." *Id.* at 7973. The FCC interpreted the TCPA's "unqualified use of the term 'capacity,' " to encompass "equipment that lacks the 'present ability' to dial randomly or sequentially" but is capable of doing so. *Id.* at 7974. The FCC found that this interpretation necessarily means that the definition of an ATDS covers all predictive dialers, even those that simply dial numbers from customer telephone lists without randomly or sequentially generating the numbers. *Id.*; *see also id.* at 7971-72 ¶ 10; *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 15391, 15392 n.5 (2012) ("The Commission has emphasized that [the] definition [of ATDS] covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." (emphasis omitted) ).

### B. Whether Defendant Called Plaintiff's Cellular Telephone

**\*7** The first element of a TCPA claim is that a defendant called the plaintiff's cellular telephone. Plaintiff asserts as a fact that defendant called her cellular telephone that ended with the last four digits 9507. (Doc. 49-2, at ¶ 3). Defendant admits that it called the telephone number with the last four digits 9507, but "denies that the evidence cited by Plaintiff evidences that Plaintiff's telephone number at issue is assigned to a cellular telephone service." (Doc.

51-1, at ¶ 3). Defendant does not, however, cite any evidence to establish that the telephone number was not assigned to a cellular telephone.

The Court finds there is no genuine issue of material fact regarding this element of the claim and finds that the telephone number with the last four digits 9507 was plaintiff's cellular telephone. In her credit card application, plaintiff provided a different telephone number for her "[h]ome phone." (Doc. 49-3, at 124). Further, in her response to Interrogatory Number Six, plaintiff identified the 9507 telephone number as her cellular telephone number. (Doc. 49-3, at 127). As noted, defendant offers no evidence to contest these facts. The party opposing a motion for summary judgment "must do more than rely on allegations or denials" in the pleadings; rather, the party opposing summary judgment must bring evidence of specific facts sufficient to raise a genuine issue of fact for trial. *Anderson*, 477 U.S. at 249. *See also Matsushita*, 475 U.S. at 587 (holding that once the moving party has met its burden, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial." (emphasis, internal quotation marks, and citation omitted) ). Viewing the evidence in the light most favorable to defendant, the Court finds no genuine issue of material fact on this issue and finds that defendant called plaintiff's cellular telephone. The Court therefore concludes that plaintiff has satisfied the first element of her TCPA claim. Viewing the evidence in the light most favorable to plaintiff, in relation to defendant's motion for summary judgment, the Court finds no genuine issue of material fact on this issue and finds that defendant called plaintiff's cellular telephone. Even when reversing the viewing of the evidence in favor of defendant in relation to plaintiff's motion for summary judgment, the Court reaches the same conclusion.

### C. Whether Defendant Used an ATDS Device to Call Plaintiff

The second element of a TCPA claim is that the call at issue was made using an ATDS device or using a prerecorded message or artificial voice. Plaintiff alleges defendant used an ATDS device to call her. Plaintiff does not allege that defendant used a prerecorded message or artificial voice. The parties are in agreement as to which devices defendant used, but disagree as to whether they legally constitute ATDS devices. [7] That question turns, in the first instance, on whether certain FCC rulings on this

issue are binding on the Court. If not, then the Court must itself interpret the scope of what the TCPA includes as an ATDS device without deference to the FCC's rulings. The Court will address these issues in turn.

### 1. FCC Rulings and ACA International

**\*8** In *ACA International*, the D.C. Circuit Court of Appeals invalidated the 2015 Declaratory Ruling's interpretation of the statutory term ATDS.[8] 885 F.3d at 703. Defendant contends that, in so doing, *ACA International* necessarily invalidated the FCC's materially identical interpretation of the term ATDS in the 2003 Order and in the 2008 Declaratory Ruling, and that this Court must, therefore, interpret the term as an original matter without regard to the FCC's findings that predictive dialers categorically qualify as ATDSs. Defendant argues that only predictive dialers with the capacity to generate and then dial random or sequential telephone numbers qualify as ATDS devices. Defendant argues that the type of predictive dialer it used—that had the more limited capacity to dial numbers from a customer telephone list—does not qualify as an ATDS. Plaintiff, on the other hand, argues that *ACA International* left the 2003 Order and 2008 Declaratory Ruling undisturbed and that all predictive dialers therefore qualify as ATDSs as a matter of law.

In *ACA International*, the court observed that the TCPA's definition of ATDS—"equipment which has the capacity ... to store or produce telephone numbers to be called, using a random or sequential number generator ... and ... to dial such numbers," 47 U.S.C. § 227(a)(1)—"naturally raises two questions: (i) when does a device have the 'capacity' to perform the two enumerated functions; and (ii) what precisely are those functions?" 885 F.3d at 695. As to the first question, *ACA International* rejected the FCC's "expansive interpretation" of the term "capacity." 885 F.3d at 696. The court noted that the FCC's 2015 Declaratory Ruling had "the apparent effect of" deeming "any and all smartphones" to be ATDSs, giving "the statute's restrictions on auto-dialer calls ... an eye-popping sweep." *Id.* at 696-97. The fundamental problem, the court explained, was that the FCC's "ruling states that equipment's 'functional capacity' includes 'features that can be added ... through software changes or updates.' " *Id.* at 696 (omission in original) (quoting 30 FCC Rcd. at 7974 n.63). The court found that the FCC's

interpretation encompassed more than was intended by the act, for example making every call made or text sent from a smartphone "without advance consent" a possible violation of federal law. *Id.* at 697. The court found such an expansive interpretation erroneous because it "would extend a law originally aimed to deal with hundreds of thousands of telemarketers into one constraining hundreds of millions of everyday callers." *Id.* at 698.

**\*9** Regarding the second question, the D.C. Circuit rejected the FCC's interpretation of the functions that equipment must have to qualify as an ATDS. Specifically, *ACA International* overturned the FCC's 2015 Declaratory Ruling "reaffirming ... the notion that a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers (and instead can only dial from an externally supplied set of numbers)." *Id.* at 702; *see 2015 Declaratory Ruling*, 30 FCC Rcd. at 7971-72 ("We reaffirm our previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of 'autodialer') even if it is not presently used for that purpose, including when the caller is calling a set list of consumers."). The court overruled the FCC's 2015 Declaratory Ruling because of what the court viewed to be fatal inconsistencies in the FCC's reasoning.

As the court explained, the 2015 Declaratory Ruling at certain points appeared to require that, to qualify as an ATDS, a device must be able to "generate and then dial 'random or sequential numbers.' " *ACA Int'l*, 885 F.3d at 702 (emphasis omitted) (quoting 30 FCC Rcd. at 7972). That requirement, the court noted, was implicit in the FCC's distinction "between use of equipment to 'dial random or sequential numbers' and use of equipment to 'call[ ] a set list of consumers.' " *Id.* (alteration in original) (quoting 30 FCC Rcd. at 7972). "Anytime phone numbers are dialed from a set list," the court added, "the database of numbers must be called in *some* order—either in a random or some other sequence. As a result, the ruling's reference to 'dialing random or sequential numbers' cannot simply mean dialing from a set list of numbers in random or other sequential order." *Id.* (emphasis in original). The court reasoned that if the FCC intended the reference to "dialing random or sequential numbers" to mean "dialing from a set list of numbers in random or other sequential order," there would have been no reason for the FCC to distinguish " 'dialing random or

sequential numbers' " and " 'dialing a set list of numbers' " as distinct activities. *Id.* (quoting 30 FCC Rcd. at 7973). The court concluded that "[i]t follows" that the FCC's 2015 Declaratory Ruling's "reference to 'dialing random or sequential numbers' means generating those numbers and then dialing them." *Id.*

The D.C. Circuit noted that at other points, the FCC's 2015 Declaratory Ruling "suggests a competing view: that equipment can meet the statutory definition even if it lacks [the] capacity" to generate and then dial random or sequential numbers. *Id.* The court pointed specifically to the FCC's decision to "reaffirm[ ] its 2003 ruling insofar as that order had found predictive dialers to qualify as ATDSs." *Id.* The court observed that in the FCC's 2003 Order, the FCC "made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS." *Id.* (citation omitted). Thus, "[b]y reaffirming that conclusion in its 2015 ruling, the [FCC] supported the notion that a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers (and instead can only dial from an externally supplied set of numbers)." *Id.*

Given the 2015 Declaratory Ruling's dissonant understandings of ATDS—one providing that "a device qualif[ies] as an ATDS only if it can generate random or sequential numbers to be dialed," and the other that "it [can] so qualify even if it lacks that capacity"—*ACA International* held that the FCC's "lack of clarity about which functions qualify a device as an autodialer" rendered unreasonable the FCC's ruling that predictive dialers categorically qualify as ATDSs. *Id.* at 702-03. Although "[i]t might be permissible for the Commission to adopt either interpretation" of the term ATDS, the D.C. Circuit observed, "the Commission [could not], consistent with reasoned decisionmaking, espouse both competing interpretations in the same order." *Id.* at 703.

**\*10** The question here is whether *ACA International* invalidated only the 2015 Declaratory Ruling's understanding of ATDS, as plaintiff contends, or also the understanding set forth in the 2003 Order and 2008 Declaratory Ruling, as defendant contends. On its face, *ACA International* addresses only the 2015 Declaratory Ruling, as the deadline for challenging the 2003 Order and 2008 Declaratory Ruling had long since passed by the time the petition for review in *ACA International* was

filed. *See id.* at 702-03 (referencing only the "2015 ruling" in holding that the FCC had given "no clear answer" to the question whether "a device [can] qualify as an ATDS only if it can generate random or sequential numbers to be dialed"). Several courts have therefore concluded that *ACA International* vacated only the 2015 Declaratory Ruling and that courts remain bound by the FCC's rulings in the 2003 Order and 2008 Declaratory Ruling that a predictive dialer can qualify as an ATDS even if it lacks the capacity to "generate random or sequential numbers to be dialed," *ACA Int'l*, 885 F.3d at 702. *See Pieterson v. Wells Fargo Bank, N.A.*, No.17-cv-02306-EDL, 2018 WL 3241069, at \*3 (N.D. Cal. July 2, 2018) ("*ACA Int'l* vacated the 2015 Declaratory Ruling but it did not clearly intend to disturb the FCC's 2003 and 2008 orders."); *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578, 598 (M.D. Tenn. 2018) ("In the wake of *ACA International*, this Court joins the growing number of other courts that continue to rely on the interpretation of § 227(a)(1) set forth in prior FCC rulings."); *McMillion v. Rash Curtis & Assocs.*, No. 16-cv-03396-YGR, 2018 WL 3023449, at \*3 (N.D. Cal. June 18, 2018) ("*ACA International* invalidated only the 2015 FCC Order—the court discusses but does not rule on the validity of the 2003 FCC Order or the 2008 FCC Order."); *Maddox v. CBE Grp., Inc.*, No. 1:17-CV-1909-SCJ, 2018 WL 2327037, at \*4 (N.D. Ga. May 22, 2018) ("Given the *ACA Int'l* decision, the Court relies on the FCC's 2003 interpretation of § 227(a)(1) to determine if Defendant's system qualifies as an ATDS."); *Swaney v. Regions Bank*, No.: 2:13-cv-00544-JHE, 2018 WL 2316452, at \*1 (N.D. Ala. May 22, 2018) ("In *ACA International*, the D.C. Circuit invalidated certain portions of the 2015 FCC Order, but not the portion of the Order reaffirming the FCC's 2003 determination that, 'while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS.' " (quoting *ACA Int'l*, 885 F.3d at 702) ); *Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp. 3d 1308, 1320-21 (S.D. Fla. 2018) ("[N]owhere in the D.C. Circuit's opinion are the prior FCC orders overruled. Indeed, that would have been impossible given that the time to appeal those orders had long passed.").

This Court sides with other courts, however, in finding that the *ACA International* holding necessarily invalidated the FCC's 2003 Order and 2008 Declaratory Ruling insofar as the 2003 Order and 2008 Declaratory Ruling also define a predictive dialer as an ATDS, even when

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.  8

the predictive dialer lacks the capacity to generate phone numbers randomly or sequentially and to then dial them. *See Roark v. Credit One Bank, N.A.*, Civ. No. 16-173 (PAM/ECW), 2018 WL 5921652, at *2-3 (D. Minn. Nov. 13, 2018) (rejecting plaintiff's argument "that *ACA Int'l* has no bearing on previous FCC rulings that determined that predictive dialing systems are autodialers"); *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 935-36 (N.D. Ill. 2018) (holding that *ACA International* overruled not only the FCC's 2015 Declaratory Ruling, but also the FCC's 2003 Order and 2008 Declaratory Ruling, both finding that a direct dialer automatically constitutes an ATDS); *Sessions v. Barclays Bank Del.*, 317 F. Supp. 3d 1208,1212–13 (N.D. Ga. 2018) ("Contrary to the pronouncement of the *Reyes* court, the D.C. Circuit clearly held that it invalidated *all* of the FCC's pronouncements as to the definition of 'capacity' as well as its descriptions of the statutory functions necessary to be an ATDS." (emphasis in original) ); *Herrick*, 312 F. Supp. 3d at 799 ("As a result of the D.C. Circuit's holding ... this Court will not defer to any of the FCC's 'pertinent pronouncements' regarding the first required function of an ATDS, i.e., whether a device that has the capacity to store or produce telephone numbers 'using a random or sequential number generator.' " (citation omitted) ).

As the court in *ACA International* noted, the FCC's 2003 Order "observed that, '[i]n the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily,' " but that "the industry had 'progressed to the point where' it had become 'far more cost effective' instead to 'us[e] lists of numbers.' " 885 F.3d at 702 (emphasis omitted) (alterations in original) (quoting 18 FCC Rcd. at 14092). The *ACA International* court held that it was not barred from reviewing the FCC's "pertinent pronouncements" and that the FCC's "prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform." *Id.* The D.C. Circuit noted that in 2003, the FCC "suggested it saw a difference between calling from a list of numbers, on one hand, and 'creating and dialing' a random or arbitrary list of numbers, on the other hand." *Id.*; *see* 2003 Order, 18 FCC Rcd. at 14091 (noting that a "predictive dialer" consists of "hardware" that, "when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers;" also noting that "[t]he principal feature of predictive dialing software is a timing

function, not number storage or generation"). But, the D.C. Circuit observed, the 2003 Order—just like the 2015 Declaratory Ruling—elsewhere "made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS." 885 F.3d at 702 (citing 18 FCC Rcd. at 14091 n.432, 14093).

**\*11** *ACA International*'s concern that the FCC in the 2015 Declaratory Ruling "fail[ed] to satisfy the requirement of reasoned decisionmaking" due to the agency's "lack of clarity about which functions qualify a device as an autodialer" thus applies with equal force to the 2003 Order. *Id.* at 703. That same concern applies to the 2008 Declaratory Ruling as well, which simply "affirm[ed]" the understanding of ATDS articulated in the 2003 Order. 2008 Declaratory Ruling, 23 FCC Rcd. at 566; *see also id.* at 566-67 ("ACA raises no new information about predictive dialers that warrants reconsideration of [the FCC's 2003 Order's] findings." (footnote omitted) ). The FCC's inconsistent reasoning in its 2015 Declaratory Ruling, in which it at some point found that a device qualifies as an ATDS only if it is capable of generating random or sequential numbers to be dialed, and at other points that a device could so qualify even if it lacks that capacity—is equally present in the FCC's two earlier decisions. When the D.C. Circuit rejected the FCC's argument that the FCC had resolved this issue in both its 2003 Order and 2008 Declaratory Ruling, the D.C. Circuit necessarily found that the 2015 Declaratory Ruling was inextricably intertwined with the 2003 Order and the 2008 Declaratory Ruling. It follows, therefore, that *ACA International* invalidates not only the 2015 Declaratory Ruling's understanding that all predictive dialers qualify as ATDSs, but also the 2003 Order and 2008 Declaratory Ruling to the extent they express the same understanding. Accordingly, the Court is not obligated to conclude that all predictive dialers qualify as ATDSs based on the FCC's prior rulings.

### 2. Whether the Predictive Dialer in this Case Was an ATDS

Having found that the FCC's prior rulings on this issue are no longer controlling, the Court must determine for itself whether the predictive dialer in this case constituted an ATDS under the TCPA without deference to the FCC's conclusion that all predictive dialers constitute ATDS

devices. The Court must interpret the TCPA as it would any other statute on this issue. *See Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008) ("In the absence of an agency interpretation of the statute, we examine section 332(c)(3)(A) as we would any other statute."); *Herrick*, 312 F. Supp. 3d at 800-01 (analyzing whether the device used by defendant was an ATDS).

Although it invalidated the FCC's rulings, *ACA International* did not itself articulate a definitive view of which functions characterize an ATDS. *See* 885 F.3d at 702-03 (noting that "[i]t might be permissible" for the FCC to conclude either that a device can "qualify as an ATDS only if it can generate random or sequential numbers to be dialed" or that it can "so qualify even if it lacks that capacity"). Plaintiff argues that defendant used a "predictive dialer" when it used the Aspect Dialer and Interaction Dialer because those devices, "when paired with certain software" have "the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." (Doc. 49-1, at 7-8). Relying on the FCC's 2003 Order and 2008 Declaratory Ruling, plaintiff asserts that the devices defendant used to call her are ATDSs because they are predictive dialers. (*Id.*). Plaintiff does not argue, and has proffered no facts, that either the Aspect Dialer or the Interaction Dialer was capable of dialing numbers from a random or sequential number generator. On the other hand, defendant has proffered uncontested evidence that neither the Aspect Dialer nor the Interaction Dialer is capable of using a random number generator to generate random telephone calls. (*See* Docs. 50-2, ¶¶ 17, 26 (citing documents that are offered as evidence in support of the undisputed material facts); 56, ¶¶ 17, 26). Thus, the question for this Court to determine is whether a predictive dialing device that calls telephone numbers from a stored list of numbers—rather than having generated those numbers either randomly or sequentially—satisfies the statutory definition of ATDS.

In construing the meaning of a statute, the Court begins with the language of the statute. The first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). The inquiry goes no further "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Id.* at 340 (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240

(1989) ). In interpreting statutory language, courts are to give words their ordinary meaning. *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (holding that " 'statutory terms are generally interpreted in accordance with their ordinary meaning' ") (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006) ). Generally, when the statutory text is plain and does not lead to an absurd result, the Court's sole function is to enforce the plain language of the statute. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). When the text leads to a result that is seemingly at odds with the congressional intent of the text, however, the plain language is not conclusive. *Ron Pair Enters., Inc.*, 489 U.S. at 242.

**\*12** To determine the congressional intent of statutory text, the Court starts again by looking at the text of the existing statute itself. *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (citation omitted). If congressional intent is not clear from the language of the statute itself, a court may consider all available evidence of that intent, rather than limiting the analysis to the text of the statute. *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 65-66, 65 n.1 (2004) (Stevens, J., concurring) (citing *Wisc. Pub. Intervenor v. Mortier*, 501 U.S. 597, 611 n.4 (1991), and other Supreme Court cases). Thus, when the statutory text is not altogether clear and there is more than one plausible interpretation of the text, it is proper to consult extratextual sources to determine congressional intent. *Id.; see also id.* at 66-67 (Kennedy, J., concurring) ("I agree with the Court's decision to proceed on the premise that the text is not altogether clear. That means that examination of other interpretive sources, including predecessor statutes, is necessary for a full and complete understanding of the congressional intent.").

As noted, the TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). According to plaintiff, the placement of the adverbial phrase "using a random or sequential number generator" indicates that the phrase modifies only the verb "produce" and not the verb "store." (Doc. 49-1, at 10). In other words, plaintiff argues that an ATDS is "equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically." (*Id.* (citation and internal quotation marks omitted) ). Conversely, defendant argues

that "when a comma precedes a dependent clause ('using a random or sequential number generator'), the dependent clause applies to *all* antecedents preceding the comma ('to store or produce telephone numbers to be called')." (Doc. 51, at 11 (emphasis in original) ).

The Court finds that the adverbial phrase "using a random or sequential number generator" modifies both "produce" and "store." In other words, the Court finds that a device meets the definition of an ATDS only when it is capable of randomly or sequentially producing, or randomly or sequentially storing telephone numbers. Plaintiff's interpretation would only be correct if subsection (a)(1) (A) read: "to store or, using a random or sequential number generator, to produce telephone numbers to be called." Rearranging the text in that manner would make it clear that "using a random or sequential number generator" modifies only "produce" and not "store." In the statute, however, the adverbial phrase is preceded by a comma and follows both verbs. The words "using a random or sequential number generator" is set off from both verbs ("store" and "produce") with a comma. For example, if the statute read "The term ATDS means equipment which has the capacity—(A) to dial, and to store or produce telephone numbers to be called, using a random or sequential number generator; and ...," the words "to dial" would still be tied to "telephone numbers to be called," but "to dial" would not be modified by "using a random or sequential number generator" because the phrase has been isolated from "to dial," and is set off from "store" and "produce." The TCPA thus defines as an ATDS a device that has the capacity "[1] to store or produce [2] telephone numbers to be called" and then "to dial such numbers." 47 U.S.C. § 227(a)(1). The comma separating "using a random or sequential number generator" from the rest of subsection (a)(1)(A) makes it grammatically unlikely that the phrase modifies only "produce" and not "store." *See Yang v. Majestic Blue Fisheries, LLC*, 876 F.3d 996, 1000 (9th Cir. 2017) ("[B]oth we and our sister circuits have recognized the punctuation canon, under which a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one where the phrase is separated from the antecedents by a comma." (internal quotation marks and alteration omitted) (citing decisions from the Second, Third, Ninth, Eleventh, and Federal Circuits) ).

**\*13** This Court disagrees with the Ninth Circuit Court of Appeals' interpretation that a device, to be considered an ATDS, must be capable of "dial[ing] [numbers generated using a random or sequential number generator] automatically." *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1053 (9th Cir. 2018). As the D.C. Circuit recognized, to place a telephone call, numbers must necessarily "be called in *some* order—either in a random or some other sequence." *ACA Int'l*, 885 F.3d at 702 (emphasis in original). As a result, were the phrase "using a random or sequential number generator" understood to refer to how telephone numbers to be called are produced rather than to how they are generated, the phrase would be superfluous, as it would simply encompass the universe of possible permutations in which numbers could be dialed. Further, if "using a random or sequential number generator" referred to the order in which numbers are dialed and not the process of generating telephone numbers, the phrase would have followed, rather than preceded, "dial such numbers" in section (a)(1)(B). Accordingly, the phrase "using a random or sequential number generator" necessarily conveys that an ATDS must have the capacity to generate or store telephone numbers, either randomly or sequentially, and then to dial those numbers. *See Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 372 (3d Cir. 2015) (holding that " 'random or sequential' number generation ... refers to the [telephone] numbers themselves rather than the manner in which [the numbers] are dialed").

This interpretation finds support in the FCC's pre-2003 understanding of the statutory term "ATDS." The 1992 Order expressed the view that "[t]he prohibitions of § 227(b)(1)"—which, as noted, make it unlawful to use an ATDS under certain conditions—"clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services ... because the numbers called are not generated in a random or sequential fashion." 7 FCC Rcd. at 8776 (footnote omitted). It is also consistent with the FCC's 1995 ruling, in which the FCC described "calls dialed to numbers generated randomly or in sequence" as "autodialed." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12400 (1995). The FCC's pre-2003 understanding of Section 227(a) (1) thus reinforces what the statute's plain text shows —that equipment qualifies as an ATDS only if it has the capacity "to function ... by generating random or sequential telephone numbers and dialing those

numbers." *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018).

The Court is not persuaded by plaintiff's reliance on the Ninth Circuit Court of Appeals' decision in *Marks*. In *Marks*, the Ninth Circuit Court of Appeals held that dialing equipment did not have to have the capacity to generate random or sequential numbers to meet the definition of an ATDS. 904 F.3d at 1053. With respect, this Court finds the *Marks* court's decision erroneous as a matter of statutory construction, for the reasons previously stated.

Similarly, the Court finds plaintiff's reliance on *Hunt v. 21st Mortg. Corp.*, No. 2:12-CV-2697-WMA, 2013 WL 12343953 (N.D. Ala. Oct. 28, 2013), misplaced. (Doc. 49-1, at 10). The language to which plaintiff cites is included in the *Hunt* court's ruling on a motion to reconsider a denial of a motion to stay proceedings. In its original order, the court held that for a system to constitute an ATDS, it "must have a *present* capacity, at the time the calls were being made, to store or produce and call numbers from a number generator." *Hunt v. 21st Mortg. Corp.*, No. 2:12-CV-2697-WMA, 2013 WL 5230061, at *4 (Sept. 17, 2013) (emphasis in original). The *Hunt* court's language in its order on the motion to reconsider does not favor plaintiff's position when placed in context of the original order.

The Court is also not convinced by plaintiff's argument that because the TCPA excludes liability for calls made with a person's consent, an ATDS need not have the capacity to randomly or sequentially generate and then call numbers. (Doc. 55, at 9). Plaintiff reasons that it makes no sense for the TCPA to apply only to devices that can generate random or sequential numbers and then call them because a caller could not, under those circumstances, give prior consent. (*Id.*). Plaintiff's logic fails, however, because a device can both (1) have the capacity to generate numbers randomly or sequentially, and (2) can be programmed to avoid dialing certain numbers, including numbers that belong to customers who have not consented to receive calls from a particular company. A violation of the TCPA, therefore, would not be a matter of coincidence, but, rather, would result from a company's failure to program an ATDS device correctly.

**\*14** Plaintiff also argues that the TCPA's exemption for calls made to collect government debt, *see* 47 U.S.C. §

227(b)(1)(A)(iii), would be nonsensical if subsection (a)(1) excluded predictive dialers because debt collectors target particular numbers they believe are likely to belong to debtors who owe money to the federal government, rather than generate and call phone numbers at random. (Doc. 55, at 9-10). That reasoning does not change the fact that the best reading of Section 227(a)(1) requires that an ATDS have the capacity to generate numbers randomly or sequentially and then dial them, even if that capacity is not utilized for practical reasons. Moreover, the TCPA regulates more than just the use of ATDS devices; it also prohibits the use of "an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A)(iii). Therefore, the existence of this statutory exception does not render the Court's conclusion nonsensical.

In summary, the Court finds that there is no genuine issue of material fact regarding the nature of the equipment defendant used to call plaintiff, and applying the law to the facts, the Court finds that the equipment used does not qualify as an ATDS. The Court therefore finds that defendant did not violate the TCPA by calling plaintiff simply by using equipment to store and call the number that plaintiff gave defendant. The critical missing feature that would have brought the device within the scope of the TCPA is the capacity to randomly or sequentially produce or store a number and then call that number. Because the Court has found that plaintiff will be unable to satisfy the second element of her claim, the Court finds that summary judgment in favor of defendant is appropriate. Nevertheless, the Court will continue to analyze the evidence regarding the third element of plaintiff's TCPA claim.

### D. Whether Defendant Called Plaintiff Without Plaintiff's Prior Consent

The third element of a TCPA violation is that defendant called plaintiff without prior consent. The parties agree that when plaintiff signed the Online Agreement, she granted consent for defendant to contact her on her cellular telephone. The parties disagree, however, on whether and when plaintiff withdrew that consent. More importantly, the parties disagree on whether plaintiff's purported oral withdrawal of consent was legally sufficient under the TCPA. The Court will address these disputed issued in turn.

### 1. Oral Withdraw of Consent

Plaintiff argues that the evidence shows she orally withdrew consent on August 5, 2015, when she told defendant to stop calling her. (Doc. 49-1, at 1). Plaintiff argues she again told defendant to stop calling her on August 13, 2015, and August 25, 2015. (*Id.*; Doc. 49-2, at ¶¶ 28-34). Defendant denies that plaintiff asked defendant to stop calling her during a telephone conversation on August 5, 2015. (Doc. 51-1, at ¶ 28). Defendant admits, however, that plaintiff asked defendant to stop calling her during a telephone conversation on August 13, 2015. (*Id.*, at ¶ 30). Finally, although defendant offers a qualified denial to the assertion that on August 25, 2015, "Plaintiff questioned why Defendant continued to call her and asked Defendant a third time to stop calling her," it is not clear whether defendant denies that plaintiff requested that defendant stop calling plaintiff, or whether defendant merely denies that the alleged request was the third such request. (*See id.*, at ¶ 30 ("The cited evidence does not reflect that Plaintiff 'asked Defendant a third time to stop calling her' based on its plain text.") ).

The Court finds that there is a genuine issue of material fact as to whether plaintiff asked defendant to stop calling her on August 5, 2015. Plaintiff says she did, defendant denies plaintiff made such a request, and the caller's notes do not reflect such a request. Nevertheless, there is no genuine issue that plaintiff orally asked defendant to stop calling her on August 13, 2015. There is also no genuine issue that defendant continued to call plaintiff after August 5, 2015. Given these findings, it is immaterial for purposes of ruling on the parties' motions for summary judgment whether plaintiff again orally asked defendant to stop calling her on August 25, 2015. Finally, there is no genuine issue that plaintiff never removed her telephone number from her online profile. As such, the question now becomes whether plaintiff's August 5, 2015 oral request that defendant stop calling her was legally sufficient to trigger a TCPA claim.

### 2. Legally Sufficient Oral Withdrawal of Consent

 **\*15** As noted, the TCPA prohibits companies from using certain devices to call consumers on their cellular telephones without prior consent. The statute is silent, however, as to whether a party that has consented to be

called can subsequently revoke that consent. Moreover, the statute does not prescribe a process by which consumers are to withdraw consent. Although the Eighth Circuit Court of Appeals has not addressed this issue, other federal circuit courts have found that the TCPA contemplated that consumers could withdraw consent that was previously given. *See, e.g.*, *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270 (3d Cir. 2013) (finding consumer could withdraw consent); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255 (11th Cir. 2014) (same). Defendant does not suggest that such non-binding precedent is erroneous.

Regarding the process by which consumers withdraw consent, in its 2015 Declaratory Ruling, the FCC concluded that "consumers may revoke consent [to be called] through any reasonable means." 2015 WL 4387780, at 21. Revoking consent by "any reasonable means" can include an oral request that a company stop calling. *See, e.g.*, *Osorio*, 746 F.3d at 1255-56 (holding that consumers may orally revoke consent, absent any contract restrictions to the contrary); *Beal v. Wyndham Vacation Resorts, Inc.*, 956 F. Supp. 2d 962, 978-79 (W.D. Wis. 2013) (holding that consumers may revoke consent orally); *Adamcik v. Credit Control Servs., Inc.*, 832 F. Supp. 2d 744, 753 (W.D. Tex. 2011) (holding that "oral revocation of consent is legally effective under the TCPA").

Defendant argues that parties may mutually agree to a particular means by which consent is to be withdrawn and, if they do so, then the parties' contractual agreement controls. (Doc. 50-1, at 9-11). Defendant relies primarily on *Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 56 (2d Cir. 2017), as well as on persuasive authority espoused in other decisions. (*Id.*). Plaintiff disagrees, arguing that the TCPA is a consumer protection statute that imposes limitations beyond the scope of contracts with consumers. (Doc. 49-1, at 6). Further, plaintiff argues that the Online Agreement's provision that a consumer "may" withdraw consent by removing the telephone number from the online account merely suggests one way to withdraw consent but does not dictate the only means of doing so. (Doc. 55, at 4-5). Finally, plaintiff argues that even if plaintiff was bound to withdraw consent strictly by removing her telephone number from her online account, defendant assented to allow plaintiff to withdraw consent orally by way of defendant's internal policy manual, which

provides that consumers may revoke consent orally. (Doc. 49-1, at 6-7).

Thus, the Court must first determine if, as a matter of law, parties can contractually limit the means by which customers can withdraw consent. If so, the Court must then determine whether, in this case, the Online Agreement limited the means by which plaintiff could withdraw consent. Finally, the Court may need to determine whether defendant's internal policy expanded the means by which plaintiff could withdraw consent.

### a. Limitations on Means of Withdrawing Consent

The Court finds that as a matter of law, parties may, by mutual agreement, limit the means by which a consumer can withdraw consent to be called on the telephone, so long as the means contracted to are reasonable. In *ACA International*, the D.C. Circuit explained that the 2015 Declaratory Ruling "did not address whether contracting parties can select a particular revocation procedure by mutual agreement" and that "[n]othing in the Commission's order thus should be understood to speak to parties' ability to agree upon revocation procedures." *ACA Int'l*, 885 F.3d at 710 (citation and internal quotation marks omitted). The D.C. Circuit explained that if the caller has contractually provided consumers with reasonable methods for withdrawing consent, "any effort to sidestep the available methods in favor of idiosyncratic or imaginative revocation requests might well be seen as unreasonable." *Id.* Thus, if a contract prescribes a reasonable means by which a signatory may withdraw previously granted consent to be called, then that procedure must be followed. A signatory cannot unilaterally change the contract by using some other means of withdrawing consent. *See Barton v. Credit One Fin.*, No. 16CV2652, 2018 WL 2012876, at *3-4 (N.D. Ohio Apr. 30, 2018) (granting summary judgment in favor of defendant where the consumer did not use the contractual means for revoking consent—in writing—and holding that the consumer could not "unilaterally alter the terms of the agreement to claim that his oral revocation of consent was valid.").

**\*16** The Court agrees with plaintiff that the Second Circuit Court of Appeals went too far in *Reyes* when it concluded that a company could effectively defeat the TCPA by including a contractual provision barring a consumer from ever withdrawing consent. *Reyes*, 861 F.3d at 56-58. Nevertheless, that conclusion does not help the plaintiff in this case because the Online Agreement provided plaintiff with a reasonable means withdrawing consent: removing plaintiff's telephone number from her online account. This is not a case, in other words, where defendant is arguing that the contract barred plaintiff from ever withdrawing consent. Further, the Court finds *Ammons*, 326 F. Supp. 3d at 593, and *Rodriguez v. Premier Bankcard, LLC*, No. 3:16CV2541, 2018 WL 4184742, at *11-13 (N.D. Ohio Aug. 31, 2018), both of which plaintiff relies on, distinguishable because in those cases, the relevant contracts only addressed giving consent and did not, as here, contain contractual provisions that addressed revocation of consent.

The Court also finds plaintiff's reliance on *Ginwright v. Exeter Fin. Corp.*, 280 F. Supp. 3d 674 (D. Md. 2017), and *McBride v. Ally Fin. Inc.*, No. 15-867, 2017 WL 3873615 (W.D. Penn. Sept. 5, 2017), misplaced because both of these cases were decided prior to the D.C. Circuit's decision in *ACA International*. Importantly, both the *Ginwright* and *McBride* courts construed the TCPA's consent provision broadly, in favor of consumers, such that consumers would have nearly an absolute right to revoke consent. *Ginwright*, 280 F. Supp. 3d at 683; *McBride*, 2017 WL 3873615, at *2. *ACA International*, which was subsequently decided, however, opened the door for litigants to argue in favor of contractually binding limitations on a consumer's ability to revoke consent. As such, the Court declines to adopt plaintiff's apparent argument that because the TCPA is intended to protect consumers, limitations cannot be placed on a consumer's ability to withdraw consent. (*See* Doc. 49-1, at 6).

Having found that parties may, by contract, agree to a reasonable means for a consumer to withdraw consent, the next question the Court must answer is whether the Online Agreement would permit plaintiff to withdraw consent by the exclusive means of removing her telephone number from her online profile.

### b. Restrictions on Means of Withdrawing Consent

The provision of the Online Agreement addressing revocation of consent to be contacted via telephone states that "[t]o revoke this authorization, you *may* edit your

profile by removing telephone numbers on which you do not want to receive such calls." (Doc. 50-3, at 23 (emphasis added) ). Plaintiff argues that the use of the word "may" means that a signatory may revoke his or her consent by means other than editing his or her profile to remove a telephone number. (Docs. 55, at 4-5; 58, at 3). In other words, plaintiff reads this provision as identifying only one way in which consent could be revoked, but reasons that plaintiff could use any reasonable means, including orally requesting that defendant stop calling her. (Docs. 55, at 4-5; 58, at 3). Plaintiff does not cite any legal authority in support of her interpretation of the contractual language. Plaintiff further argues that if the language of this provision is ambiguous as to its meaning, then "any ambiguities must be held against the drafter of the Agreement." (Doc. 58, at 3 (footnote omitted) ). Defendant disagrees with plaintiff's interpretation, and argues that the word "may" does not suggest that a consumer is free to withdraw consent by other means. (Doc. 57, at 2). Rather, defendant argues that the contract provides that removing a number from the online profile is the exclusive means by which a signatory can withdraw consent to be called. (*Id.*, at 2-3).

As a general rule of statutory or contract construction, "may" is permissive, whereas "shall" is mandatory. *See, e.g.*, *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947); *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006) (stating that as a general rule, " 'may' is permissive, whereas 'shall' is mandatory" (citations omitted) ); *Braswell v. City of El Dorado, Ark.*, 187 F.3d 954, 958-59 (8th Cir. 1999) (finding the words "as may be appropriate" in a statute as granting the court discretion whether to impose various listed remedies). *See also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 112-15 (Thomson West 2012) (stating that, ordinarily, the word "may is permissive," while "shall is mandatory" (emphasis omitted) ).

**\*17** On the other hand, the word "may" can be permissive in one instance and mandatory in another. *See, e.g.*, *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432-34, 432 n.9 (1995) ("Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.' "); *John T. v. Marion Indep. Sch. Dist.*, 173 F.3d 684, 688-89 (8th Cir. 1999) (finding that the word "may" imposed a mandatory duty because to read "may" as permissive would create an illogical result, inconsistent with the intent

of the legislation). *See also* BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 939 (2d ed., Oxford Univ. Press 1995) ("[C]ourts in virtually every English-speaking jurisdiction have held—by necessity—that *shall* means *may* in some contexts, and vice-versa."). But as Mr. Garner notes, the chameleonic nature of these words is a result of "slipshod drafting." (*Id.*).

Defendant argues that the use of the word "may" in the context of the sentence really means "must." (Doc. 57, at 2). Defendant argues that this is so because the word is used in a two-part sentence. (*Id.*). The first part is an "introductory infinitive phrase followed by a comma ("To revoke this authorization,")," and is followed by the subsequent clause ("you may edit your profile ...."). (Doc. 57, at 2). Defendant argues that "[t]he use of an infinitive phrase conveys the purpose of the sentence, 'with the following clause or phrase serving to indicate the desired manner' of effecting that outcome." (*Id.* (quoting *Tauese v. State*, 147 P.3d 785, 814 (Haw. 2006), and citing *Am. Heritage Window Fashions, LLC v. Dep't of Revenue*, 191 So.3d 516, 520 (Fla. 2d Dist. Ct. App. 2016) ) ).

Defendant's reasoning does not lead to a conclusion that removing a telephone number from a consumer's online profile is the only manner by which a customer can revoke consent to be called. The Court accepts that the language reflects that removing a telephone number from a consumer's online profile may very well be the "desired manner" for a customer to revoke consent to be called. That it is the desired manner, however, does not necessarily mean that it is the *only* manner.

Further, defendant's reliance on *Tauese* is misplaced. In that case, the defendant argued that the government could not impose a fine because the defendant never received any benefits from his fraudulent conduct. The defendant pointed to the statutory language: that " 'any person who violates subsections (a) and (b) *may* be subject to the administrative penalties of restitution of benefits or payments fraudulently received ..., and one or more' of the administrative penalties enumerated in HRS § 386–98(e)(1)–(6)." *Tauese*, 147 P.3d at 814 (emphasis altered). The *Tauese* court held that the language did not mean that defendant must have received some benefit before any fine could be imposed. Rather, the court found that restitution of benefits was one of the multiple punishments that could be imposed. In other words, the *Tauese* court read the use of the word "may" as permissive, not mandatory.

Thompson Harbach v USAA Federal Savings Bank, Slip Copy (2019)

Defendant's reliance on *American Heritage* is equally misplaced. That case involved a dispute over two sections of a statute. One section provided two ways by which a taxpayer "may" bring an action to contest a tax assessment. *See Am. Heritage Window Fashions, LLC*, 191 So.3d at 519 (quoting FLA. STAT. § 72.011(1)(a) (2014) ). The following section stated: "An action may not be brought to contest an assessment of any tax ... more than 60 days after the assessment becomes final." *Id.* (quoting FLA. STAT. § 72.011(2)(a) ). The dispute in that case was whether the action the plaintiff "brought" was "to contest" a tax assessment or a refund. *Id.* at 520. The use of the word "may" in the statute in that case showed the permissive meaning of the word, giving two options for how a taxpayer could contest an assessment. *Id.* It also used "may not" in a way to identify what was not permissive: contesting an assessment more than 60 days later. *Id.* at 519-20.

**\*18** Contracts and statutes must be read as a whole to discern meaning. *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (describing "the cardinal rule that a statute is to be read as a whole since the meaning of statutory language, plain or not, depends on context" (citations omitted) ). Reading the Online Agreement as a whole makes it clear that "may" is used in the permissive. The word "may" appears, in isolation, at least 28 times throughout the Agreement and, where it is used, the context demonstrates that it is used as a permissive term. (*See, e.g.*, Doc. 50-3, at 22 ("USAA may amend this Agreement at any time.") ). Moreover, defendant, in drafting the Agreement, used "may not" when intending to restrict the customer's options. (*See, e.g.*, *id.*, at 26 ("You may not pursue any type of collective action or class action against [USAA] in court or in arbitration.") ). With respect to revocation of consent to be contacted via telephone, the Online Agreement sets forth only as follows: "To revoke [consent], you may edit your profile by removing telephone numbers on which you do not want to receive calls." (Doc. 50-3, at 23). The quoted sentence marks the conclusion of the section regarding consent, and the following sentence addresses privacy. That is, defendant, in drafting the Online Agreement, stated only one method in which a signatory "may" revoke consent, but defendant did not include any subsequent limitations or qualifications. Had defendant in this case followed the use of the permissive "may" by going on to state that a signatory "may not" withdraw consent

by any means other than by removing the telephone number from the online profile, then defendant would have clearly delineated the one and only way a customer could withdraw consent. Defendant did not do this.

It does not follow that the use of the word "may" implies "may not." *See Saxton v. Fed. Hous. Fin. Agency*, 901 F.3d 954, 958 (8th Cir. 2018) (refusing to find an implied "may not" in a statute where Congress stated that FHFA "may" take certain actions). This is especially true when, as here, defendant, in drafting the contract, used the words "may not" at least eleven times in other sections of the Online Agreement. (*See, e.g.*, Doc. 50-3, at 26 (3 times), 28 (1 time), 29 (7 times) ). Moreover, defendant used other mandatory language when it chose to do so. The Online Agreement uses the words "may only" in at least two places (*id.*, at 22, 24), "must" in at least eleven places (*id.*, at 25 (1 time), 26 (10 times) ), "shall" in at least ten places (*id.*, at 25 (2 times), 26 (5 times), 27 (3 times) ), and "shall not" at least three times (*id.*, at 26 (1 time), 27 (2 times) ). Thus, in reading the Online Agreement as a whole, it is apparent that when the Agreement provides that "[t]o revoke this authorization [to be called via telephone], you may edit your profile by removing telephone numbers on which you do not want to receive such calls," the Agreement is providing one way, but not necessarily the only way, in which a signatory can revoke authorization to be called.

Even if the Court were to conclude that the use of the word "may" is ambiguous, in applying the doctrine of *contra proferentem*, the Court would construe ambiguous language against the drafter. *See Shaw Hofstra & Assocs. v. Ladco Dev., Inc.*, 673 F.3d 819, 828-29 (8th Cir. 2012) (holding that district courts have discretion to apply the doctrine of *contra proferentem* ). Without engaging in a discussion of the propriety of relying upon the doctrine of *contra proferentem*, the Court will note that the Court's application of the doctrine would be due, in part, to the parties' unequal bargaining power. *See Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 692 (8th Cir. 1997) (declining to apply the doctrine of *contra proferentem*, in part, because the parties to the contract had relatively equal bargaining power).

Accordingly, the Court finds that the Online Agreement does not establish an exclusive means by which a signatory may revoke consent to be called on the telephone. The Court therefore concludes that under the TCPA, plaintiff

Thompson-Harbach v. USAA Federal Savings Bank, Slip Copy (2019)

was free to withdraw her consent by any reasonable means, including by making an oral request.

#### c. Defendant's Internal Policy

Having concluded that the Online Agreement permitted plaintiff to revoke her consent orally, the Court need not reach the issue of whether defendant's internal policy—which instructs its employees that customers can revoke consent through any reasonable means, including orally—somehow altered the Agreement. Nevertheless, the Court concludes that the internal policy did not change the Agreement. The policy is an internal policy and is not made available to defendant's customers. A company may adopt an internal policy that provides more benefits to its customers than those benefits required under a contract. See *Cross v. Prairie Meadows Racetrack and Casino, Inc.*, 615 F.3d 977, 982 (8th Cir. 2010) (holding that an employer could adopt internal policies more favorable to an employee than required by employment law without fear that the employer would be subject to additional liability for doing so). See *Citimortgage, Inc. v. Equity Bank, N.A.*, 261 F. Supp. 3d 942, 953 (E.D. Mo. 2017) (noting that if a contract is ambiguous, a company's internal policy reflecting the company's understanding of the contract may be relevant in resolving the ambiguity).

### V. CONCLUSION

**\*19** In summary, the Court finds there is no genuine issue of material fact regarding the type of equipment defendant used to dial plaintiff's telephone number and concludes as a matter of law that the equipment does not fall within the definition of an ATDS. As such, the Court

finds that defendant did not violate the TCPA by using the equipment to assist its employees and agents in calling the telephone number plaintiff provided. Plaintiff's inability to establish the second essential element of plaintiff's claim renders summary judgment in favor of defendant appropriate. Having found summary judgment in favor of defendant appropriate, the Court will not reach the question of whether plaintiff could have pursued treble damages on these facts. Likewise, it is not necessary for the Court to address defendant's Motion to Strike Plaintiff's Summary Judgment Evidence (Doc. 52) because the Court reached its conclusion in spite of plaintiff's proffered evidence. Finally, given the Court's ruling, defendant's Motion to Strike Expert Testimony and Report of Randall Snyder (Doc. 53) is moot.

**IT IS ORDERED:**

Plaintiff's Motion for Summary Judgment (Doc. 49) is **denied**;

Defendant's Motion for Summary Judgment (Doc. 50) is **granted**;

Defendant's Motion to Strike Plaintiff's Summary Judgment Evidence (Doc. 52) is **denied as moot**; and

Defendant's Motion to Exclude the Expert Witness Testimony and Report of Randall Snyder (Doc. 53) is **denied as moot**.

**IT IS SO ORDERED** this 9th day of January, 2019.

**All Citations**

Slip Copy, 2019 WL 148711

#### Footnotes

1   Defendant has advised that defendant is incorrectly styled and should instead be styled as "USAA Savings Bank." (Doc. 38, at 1). The Court's commentary on this issue only extends to the point of recognizing the discrepancy.

2   Unless otherwise noted, the facts set forth herein have been derived from admitted portions of the parties' statements of material fact. (Docs. 49-2, 50-2, 51-2, 56, 59). To the extent one of the parties disputes a material fact, and the Court finds the fact to be material in its analysis, the Court notes herein its resolution of the factual dispute.

3   Defendant asserts that the Online Agreement is a separate agreement from the account between plaintiff and defendant and that plaintiff was not required to enter into the Online Agreement in order to apply for, or to maintain, her credit card account. (Doc. 50-2, at ¶ 4; Doc. 51-2, at ¶ 6). Plaintiff has provided conflicting responses to the assertions that the Online Agreement is a separate agreement from the Account between plaintiff and defendant and that plaintiff was not required to enter into the Online Agreement in order to apply for, or to maintain, her credit card Account. Plaintiff admitted these facts in her Response to Defendant's Statement of Undisputed Facts. (Doc. 56, at ¶ 4). In responding to

defendant's Statement of Additional Material Facts, however, plaintiff objected, stating that these assertions "[c]all[ ] for a legal conclusion as to any requirement on behalf of Plaintiff regarding the Online Agreement." (Doc. 59, at ¶ 6). The Court finds that whether the Online Agreement is a "separate agreement," and what, if any, legal consequences would flow from its characterization as a "separate agreement," are legal conclusions. Whether plaintiff was required to enter into the Online Agreement to maintain her account, however, is a mixed conclusion of fact and law, but the Court finds that this issue is immaterial to resolution of the pending motions for summary judgment.

4   The parties dispute whether the evidence shows that this number is assigned to a cellular telephone. (*See* Docs. 49-2, ¶¶ 3, 7, and 51-1, at ¶ 3). The Court resolves this dispute *infra* by finding that the there is no genuine issue as to whether the telephone number was a cellular telephone number and that the number was, in fact, plaintiff's cellular telephone number.

5   Although neither party explained in their briefing what a "campaign" is, the Court understands it to be some type of program containing lists of stored telephone numbers that causes the dialing of those numbers based on various criteria. Regardless, the precise definition of a campaign does not appear to be material to resolution of the parties' motions for summary judgment.

6   The Court notes that plaintiff objects to paragraph fourteen of defendant's Statement of Additional Material Facts on the basis that the purported fact "calls for legal conclusions as to the incorporation of Defendant's internal policy." (*See* Docs. 51-2, at ¶ 14; 59, at ¶ 14). Defendant's paragraph fourteen states in its entirety: "[Defendant's] members do not have access to, and are not provided with, [defendant's] internal policies, and they are not incorporated into the Online Agreement (or any other agreement a member has with [defendant] )." (Doc. 51-a, at ¶ 14). The Court finds that plaintiff's objection is misplaced as to the first portion of defendant's paragraph fourteen because the assertion that "members do not have access to, and are not provided with, [defendant's] internal policies" states facts. The Court accepts that the second half of the objected-to sentence, dealing with incorporation of the policy into an agreement, does call for a legal conclusion.

7   Plaintiff alleges defendant is vicariously liable for URS using the Interaction Dialer to contact plaintiff. (Doc. 49-1, at 7 n.2). Defendant does not directly respond to this assertion in its briefing or seriously contest its vicarious liability. Accordingly, for the purposes of this Order, the Court will assume that defendant is vicariously liable for URS's use of the Interaction Dialer to call plaintiff.

8   The parties treat *ACA International* as binding authority, and the Court will treat *ACA International* as precedential for purposes of this case. (Docs. 50-1, at 11 n.4; 49-1, at 8-9 (differentiating between FCC orders that arguably remain good law following *ACA International*, and the 2015 Order, which defendant concedes is no longer good law following *ACA International*; such concession carries the implication that *ACA International* is binding nationwide) ). The Court notes that numerous courts across the country have treated *ACA International* as binding authority, which is in line with this Court's decision to treat *ACA International* as precedential. *See, e.g.*, Herrick v. GoDaddy.com, LLC, 312 F. Supp. 3d 792, 797 & n.5 (D. Az. 2018) (finding *ACA International* binding on the court); Marshall v. CBE Group, Inc., No. 2:16-cv-02405-GMN-NJK, 2018 WL 1567852 at *5 n.4 (D. Nev. Mar. 30, 2018) (rejecting plaintiff's argument that *ACA International* was not binding on that court "because appellate courts have exclusive jurisdiction to determine the validity of all FCC final orders and the Judicial Panel on Multidistrict Litigation has consolidated the various appeals in that case in the D.C. Circuit");Cabiness v. Educ. Fin. Sols., LLC, No. 16-cv-01109-JST, 2017 WL 167678, at *3 (N.D. Cal. Jan. 17, 2017) ("Although the *ACA International* decision will be binding on this Court, there is currently no live ATDS issue with respect to the Plaintiff in this case." (footnote omitted) ).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   18